Craig C. Marchiando (SBN 283829)
craig@clalegal.com
**CONSUMER LITIGATION ASSOCIATES, P.C.**
1 Embarcadero Center, Suite 1200,
San Francisco, CA 94111
Tel: (757) 930-3660
Fax: (757) 257-3450

*Attorney for Plaintiff Peggy Anne Hansen*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### Southern Division

| | |
|---|---|
| **PEGGY ANNE HANSEN,** ) | **Case No.** _____ |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **EXPERIAN INFORMATION** ) | **COMPLAINT AND DEMAND FOR** |
| **SOLUTIONS, INC.; TRANS UNION,** ) | **JURY TRIAL** |
| **LLC, EQUIFAX INFORMATION** ) | |
| **SERVICES, LLC; KIA** ) | |
| **INCORPORATED; and TROPHY** ) | |
| **AUTOMOTIVE DEALER GROUP,** ) | |
| **LLC,** ) | |
| ) | |
| **Defendants.** ) | |

COMES NOW, the Plaintiff, PEGGY ANNE HANSEN (the "Plaintiff"), by Counsel, and for her Complaint against Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), Equifax Information Services, LLC ("Equifax"), Kia Incorporated ("Kia"), and Trophy Automotive Dealer Group, LLC ("Trophy Automotive"), she alleges as follows:

### PRELIMINARY STATEMENT

1. This is an action for actual, statutory, and punitive damages, costs and attorneys' fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x

("FCRA"); the California Consumer Credit Reporting Agencies Act, CAL. CIV. CODE §§ 1785.1–1785.36 ("CCRAA"); California's Elder Abuse & Dependent Adult Civil Protection Act, CAL. CIV. CODE §§ 15600–15675; the California Consumers Legal Remedies Act, CAL. CIV. CODE §§ 1750-1784 ("CLRA"); and California's False Advertising Law, CAL. BUS. & PROF. CODE §§ 17500-17509.

2.    The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

3.    The California Consumer Credit Reporting Agencies Act provides additional protections for residents of California with regard to this same class of civil rights.

4.    Statutes like the FCRA and CCRAA therefore provide consumers with the only mechanism by which they can force CRAs and furnishers to report accurate information about them.

5.    Claims under these protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

6.    The three major consumer reporting agencies ("CRAs") in the United States are Experian, Trans Union, and Equifax ("Defendant CRAs").

7.    CRAs that create and sell consumer reports are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities that furnish information to them, like Co-Defendant Kia, particularly when a consumer makes a dispute about inaccurate information that the CRAs are reporting.

8.    The FCRA demands reporting agencies like Experian, Trans Union, and Equifax utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). Under the CCRAA, a "furnisher" (like Kia) is prohibited from furnishing information if it knows (or should know) that the information is incomplete or inaccurate. CAL. CIV. CODE § 1785.25.

9.    When a consumer like Plaintiff disputes information through the CRAs, those disputes are electronically transmitted to the parties furnishing the information, in this case the furnisher is Defendant Kia.

10.    When a consumer disputes an item of information, under the FCRA, the agency must investigate the dispute and—if the information cannot be verified—delete it. 15 U.S.C. § 1681i. The CCRAA imposes similar requirements upon consumer reporting agencies with regard to disputes made by citizens of the State of California. CAL. CIV. CODE § 1785.16.

11.    Also, when a consumer disputes the inaccuracy of information with Experian, Trans Union, and Equifax, the CRA receiving the dispute must transmit the dispute to the entity who furnished the information, in order for the furnisher to conduct its own investigation. The FCRA demands that each party *separately* conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

12.    Plaintiff brings claims under § 1681e(b) against Experian, Trans Union, and Equifax because each reported inaccurate information regarding the account with Kia.

Plaintiff also asserts claims against Kia under CAL. CIV. CODE § 1785.25 for furnishing information when it knew or should have known that the information was inaccurate.

13.    When Plaintiff disputed the inaccuracies, Experian, Trans Union, and Equifax did not reasonably investigate her disputes, also violating § 1681i of the FCRA and CAL. CIV. CODE § 1785.16.

14.    The Consumer Financial Protection Bureau has noted that "experience indicates that [CRAs] lack incentives and under-invest in accuracy." CONSUMER FIN. PROT. BUREAU, *Supervisory Highlights Consumer Reporting Special Edition* 21 (Issue 14, March 2, 2017).[1]

15.    The CFPB's accuracy comments are particularly true as to how Experian, Trans Union, and Equifax have complied with their over 50-year-old obligation to conduct a meaningful accuracy investigation. Experian, Trans Union, and Equifax have been repeatedly sued by consumers, sanctions by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, they would not have harmed Plaintiff.

16.    Likewise, Kia violated the FCRA, § 1681s-2(b), when it received Plaintiff's disputes about the fraudulent account from Experian, Trans Union, and Equifax, and failed to reasonably investigate those disputes. Instead, discovery will show all Kia did was consult its own records about the account and confirm to the agencies the inaccurate information it was already reporting.

17.    In addition to claims pursuant to the Federal Fair Credit Reporting Act and the California Consumer Credit Reporting Agencies Act, Plaintiff asserts claims under California's Elder Abuse & Dependent Adult Civil Protection Act, the California Consumers Legal Remedies Act, and California's False Advertising Law.

---

[1] *Available at* https://files.consumerfinance.gov/f/documents/201703_cfpb_Supervisory-Highlights-Consumer-Reporting-Special-Edition.pdf (last visited May 6, 2020).

## JURISDICTION AND VENUE

18.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1681p, and 28 U.S.C. § 1367.

19.    Venue is proper in this District because Plaintiff is a resident of this District, the violations occurred in this District, and the Defendants transact business within this District.

## PARTIES

20.    Plaintiff Peggy Hansen is a natural person who resides in Irvine, California. She is a "consumer" as defined by 15 U.S.C. § 1681a(c).

21.    Plaintiff was an "elder" as defined in CAL. CIV. CODE ANN. § 15610.27 and a "senior citizen" as defined in CAL. CODE ANN. § 1761(f) at all times relevant to the claims asserted in this Complaint.

22.    Experian conducts business in the State of California through its registered agent, C.T. Corporation System, located at 3300 N Brand Blvd Ste 700, Glendale, California 91203.

23.    Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is also a "consumer credit reporting agency" as defined in CAL. CIV. CODE ANN. § 1785.3(d). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer and consumer credit reports, as defined in 15 U.S.C. § 1681a(d) and CAL. CIV. CODE ANN. § 1785.3(d), to third parties.

24.    Experian disburses consumer reports to third parties under contract for monetary compensation.

25.    Trans Union conducts business in the State of California through its registered agent, The Prentice-Hall Corporation System, Inc., located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

26.    Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Trans Union is also a "consumer credit reporting agency" as defined in CAL. CIV. CODE ANN. § 1785.3(d). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer and consumer credit reports, as defined in 15 U.S.C. § 1681a(d) and CAL. CIV. CODE ANN. § 1785.3(d), to third parties.

27.    Trans Union disburses consumer reports to third parties under contract for monetary compensation.

28.    Equifax conducts business in the State of California through its registered agent, The Prentice-Hall Corporation System, Inc., located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

29.    Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is also a "consumer credit reporting agency" as defined in CAL. CIV. CODE ANN. § 1785.3(d). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer and consumer credit reports, as defined in 15 U.S.C. § 1681a(d) and CAL. CIV. CODE ANN. § 1785.3(d), to third parties.

30.    Equifax disburses consumer reports to third parties under contract for monetary compensation.

31.    Kia Incorporated ("Kia") is a domestic corporation which is headquartered in Irvine, California. Kia conducts business in the State of California through its registered agent: Beatrice Casarez-Barrientez, C T Corporation System, 330 N. Brand Blvd., Glendale, California 91203.

32.    Kia is a "furnisher" of information as governed by 15 U.S.C. § 1681s-2.

33.    Trophy Automotive Dealer Group, LLC ("Trophy Automotive") is a foreign limited liability corporation with its principal address located at 21140 Avalon Blvd., Carson, California 90745.

# FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of Experian, Trans Union, and Equifax's Creditor-Customers*

34.    "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

35.    "Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *4.

36.    Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

37.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

38.     It has long been the law that a CRA, such as Experian, Trans Union, or Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

39.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. TransUnion Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

40.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

41.     Further, as the CRA Defendants are aware, courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that CRA Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

42.     It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[2]

43.     Today, furnishers such as Kia have their own independent rules under the FCRA, principally those found at 15 U.S.C. § 1681s-2. Congress enacted these duties on furnishers almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

---

[2] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary interpretations/110720fcrareport.pdf.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### *Background Facts*

44.     In April of 2017, Plaintiff leased a 2016 Kia Optima from Kia of Cerritos.

45.     In April of 2020, at the end of that first lease, Plaintiff returned the 2016 Kia Optima and leased a 2020 Optima from Kia of Cerritos.[3]

46.     At the time of the execution of the second lease, Plaintiff asked the sales representative for the amount she would need to pay for additional mileage that she accumulated on the 2016 Kia Optima.

47.     In response to Plaintiff's question about payment for the mileage, the sales representative told Plaintiff that she did not need to worry about it because he would "roll it into" the new lease.

48.     Plaintiff believed the representative's statement and executed the new lease on the 2020 Optima.

49.     Plaintiff proceeded to make all monthly payments on the 2020 Kia Optima as they came due.

50.     In April of 2024, at the conclusion of her second lease, Plaintiff went to Kia of Irvine. She went through the purchase/lease process, and upon the Finance Department checking her credit, they told her they could not finance any transaction for her because there was a "charge-off" of $1,433.13 from Kia. When she questioned what it was, Kia of Irvine told her that she had to speak to Kia Finance to correct it.

51.     Plaintiff subsequently called Kia Finance and asked about the charge-off. The Kia Finance representative told Plaintiff that it was a deficit from the payoff of the lease on the 2016 Optima. Plaintiff asked why she was never notified, and they told Plaintiff that "they sent a letter". Plaintiff asked why no one sent a bill or made a call, and the Kia Finance representative told her they could not speak to her further.

_____

[3] Kia of Cerritos was subsequently purchased by Trophy Automotive.

***Plaintiff Discovers the CRAs Reporting the Derogatory Account on her Credit, and Disputes the Inaccuracies with Experian, Trans Union, and Equifax***

52.    In May and June of 2024, Plaintiff obtained copies of her credit files with the CRA Defendants and discovered that all three were reporting inaccurate information regarding the Kia account. Specifically, all three Defendant CRAs were reporting the Kia account with a "charged off" amount of $1,433. Additionally, Equifax and Experian were both reporting an incorrect balance of $1,433.

53.    The information was inaccurate. Kia had told Plaintiff that any balance from the first lease would be rolled into the second lease, and Plaintiff paid all amounts that Kia billed to her in a timely manner.

54.    All of this is objectively determinable from Kia's and the dealership's records.

55.    In or around September of 2024, Plaintiff mailed dispute letters to all three Defendant CRAs via certified mail, return receipt requested. In each respective letter, Plaintiff disputed the CRAs' reporting of the Kia account as "charged off". With each letter, Plaintiff included her full social security number, her date of birth, and her full address. Plaintiff also had each letter notarized and included a copy of her driver's license so that each Defendant CRA would know that Plaintiff legitimately sent the dispute.

56.    On or around September 19, 2024, Equifax mailed a letter to Plaintiff—in response to her notarized dispute letter containing her full social security number, her date of birth, and her full address—requesting additional proof of Plaintiff's identity.

57.    On or around October 4, 2024, Experian mailed a letter to Plaintiff—in response to her notarized dispute letter containing her full social security number, her date of birth, and her full address—requesting additional proof of Plaintiff's identity.

58.    Equifax and Experian will sell anyone a consumer report about Plaintiff with less identifying information than Plaintiff provided with her disputes.

59.     On or around October 7, 2024, Experian mailed "dispute results" to Plaintiff in response to her September 2024 dispute letter. Experian's "dispute results" indicated that Experian sent Plaintiff's dispute to Kia, and Kia "verified" the disputed information it was reporting regarding Plaintiff's account. Kia and Experian continued to wrongfully report the inaccurate and derogatory Kia account information on Plaintiff's credit.

60.     On or around October 8, 2024, Trans Union mailed "investigation results" to Plaintiff in response to her September 2024 dispute letter. Trans Union's "investigation results" indicated that Trans Union sent Plaintiff's dispute to Kia, and Kia verified (and "updated") the information it was reporting regarding Plaintiff's account. The "results" also showed that Kia failed to mark the account as "disputed" in response to Plaintiff's dispute. Kia and Trans Union continued to wrongfully report the inaccurate and derogatory Kia account information on Plaintiff's credit.

61.     On or around October 18, 2024, Plaintiff mailed a copy of her driver's license and social security card to Equifax. Plaintiff included a copy of the letter that Equifax had sent to her dated September 19, 2024.

62.     On or around October 25, 2024, Plaintiff sent a second dispute letter to Experian. She included the specific proof of identification that Experian requested (a copy of her social security card, a copy of her driver's license, and a copy of a recent bill showing her address). Like her first dispute letter to Experian, Plaintiff had the letter notarized.

63.     Plaintiff obtained a copy of her Equifax credit report on or around October 31, 2024, and discovered that Equifax was still reporting inaccurate and derogatory information from Kia on Plaintiff's Equifax report. Specifically, the report showed the Kia account as a paid charge-off. The report did not indicate that Kia had marked the account as "disputed" following Plaintiff's disputes.

64.     On or around November 13, 2024, Experian mailed "dispute results" to Plaintiff in response to her October 2024 dispute letter. Experian's "dispute results"

indicated that Experian sent Plaintiff's dispute to Kia, and Kia "verified" the disputed information they were reporting regarding Plaintiff's account. The "results" also showed that Kia failed to mark the account as "disputed" in response to Plaintiff's dispute. Kia and Experian continued to wrongfully report the inaccurate and derogatory Kia account information on Plaintiff's credit.

65.    Upon information and belief, Plaintiff did not receive dispute results from Equifax in response to her September 2024 dispute letter.

66.    Upon information and belief, Equifax, Experian, and Trans Union are all continuing to report the inaccurate and derogatory information from Kia on Plaintiff's reports.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

67.    Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax, Trans Union, and Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Equifax and Trans Union use a vendor, previously known as Intelenet Global Services, and now known as Teleperformance.

68.    Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[4]

69.    Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes

---

[4] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue the 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Equifax for its farming-out investigations to Teleperformance.

for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication. That mailbox company receives consumer disputes and scans them into a batch with other disputes.

70.    Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

71.    Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

72.    Teleperformance agents and Experian Chile agents are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

73.    The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

74.    In fact, all three consumer reporting agencies strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union and Experian.  The dispute is sent to the Defendant CRAs' creditor customers (such as Kia) for their sole review and consideration.

75.    Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with

Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

76.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

77.     Regardless of whether these statements by the CRAs are correct, the consumer reporting agencies believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

78.     Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused the disputes to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRAs Forwarded
### Plaintiff's Disputes to Defendant Kia, Who Did Nothing

79.     When Plaintiff disputed the Kia account with the CRAs, the CRAs forwarded Plaintiff's disputes to Kia using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

80.     e-Oscar is also the system by which Kia has agreed it will accept such consumer disputes from the CRAs.

81.     Each time that Kia received one of Plaintiff's disputes from a CRA, Kia became obligated under the FCRA to investigate that dispute.

82.     Kia failed to reinvestigate Plaintiff's dispute.

83.     The "charge-off" information furnished by Kia to Experian, Trans Union, and Equifax was at all times inaccurate.

84.     Plaintiff paid all amounts billed to her by Kia in a timely manner.

85.     On or about a date better known to Kia and Equifax, Equifax furnished Plaintiff's dispute to Kia.

86.     On or about a date better known to Kia and Experian, Experian furnished Plaintiff's dispute to Kia.

87.     On or about a date better known to Kia and Trans Union, Trans Union furnished Plaintiff's dispute to Kia.

88.     At least two of the CRAs responded to Plaintiff's disputes, claiming the information reported was verified as accurate and the information was updated. These responses confirm that the CRAs communicated Plaintiff's dispute to Kia.

89.     By its actions as described herein, Kia furnished false credit information in an attempt to oppress and harass Plaintiff.

### *Plaintiff Suffered Actual Harm*

90.     Experian, Trans Union, and Equifax continue to report the derogatory information on Plaintiff's credit reports, despite being notified repeatedly that the information is inaccurate.

91.     Plaintiff has been attempting to resolve these matters with Defendants and her credit has been destroyed by Defendants' failures to correct the inaccurate reporting.

92.     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

        a.     Harm to her credit and loss of credit opportunities;

b.     Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

c.     Loss of time attempting to cure the error;

d.     Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life;

e.     Stress associated with attempting to resolve this matter;

f.     Fear of embarrassment and reluctance to apply for credit;

g.     Loss of privacy and harm to her reputation.

### *Defendants' Violations were Willful*

93.     The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

94.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

95.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The Defendant's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

96.     Experian, Trans Union, and Equifax have received many disputes and other complaints regarding the creditors at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

97.    Just in federal court alone, during the last decade, the creditor-furnisher disputed by Plaintiff has had to defend over 80 consumer lawsuits.

98.    In many or even most of these FCRA lawsuits brought by a consumer, Experian, Trans Union, Equifax were named co-defendants.

99.    Experian, Trans Union, Equifax knew or should have known of this litigation history. They use and have access to PACER to investigate and monitor such consumer complaints.

100.    The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

101.    Defendants regularly receive unredacted consumer dispute details from this database.

102.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

103.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

104.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

105.    Further, over 230,000 of the CFPB complaints against Equifax, more than 220,000 complaints as to Trans Union, and over 230,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

106.    Just in the last 12 months alone, Experian, Trans Union, and Equifax have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

107.    While the thousands of consumer complaints and hundreds of consumer disputes alone would have put Experian, Trans Union and Equifax on notice of the failures of its dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed Experian, Trans Union, and Equifax on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

108.    Experian, Trans Union, Equifax had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information.").

109.    Experian, Trans Union, and Equifax have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

110.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[5]    The AG Settlement required amongst many changes and mandates that Experian comply with § 1681i(a).

111.    The AG Settlement also required the CRAs to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these

---

[5]    *Available    at*    https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx

requirements, Experian, Trans Union, and Equifax did not meaningfully comply with the AG Settlement in these regards.

112.    The CRA Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[6]

113.    The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian, and Trans Union) and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

114.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

---

[6]    *Available    at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

115. The overwhelming amount of public criticism and growing awareness of the CRAs' failures has led at least one Defendant CRA, Experian, to frequently push for arbitration in lieu of litigation. Addressing so many cases though arbitration has lowered Experian's exposure to justice through the court system. However, arbitrators recognize the substantial amount of evidence demonstrating that Experian willfully disregards the rights of consumers under the FCRA, and they are awarding damages accordingly. In *Duncan v. Experian Information Solutions, Inc.*, which shared many similarities to the underlying facts in this case, Experian reported inaccurate information from PNC Bank on Mr. Duncan's Experian credit report. Although Mr. Duncan disputed the information with Experian, Experian failed to conduct any actual "reinvestigation" of Mr. Duncan's disputes, as required by Section 1681i of the Federal Fair Credit Reporting Act. Instead, Experian relied entirely on the information sent to it by the "furnisher", PNC Bank. The arbitrator in the Duncan case ordered Experian to pay Mr. Duncan "for actual damages $400,000, together with $50,000 for each month it continues to report the PNC information, up to a maximum of another $300,000." The arbitrator further found Experian's violations to be willful, and ordered that Experian pay Mr. Duncan $700,000 in punitive damages.

116.    Further, Kia has received several dozen CFPB complaints from consumers for reporting inaccurate information on consumer credit reports. Many of these complaints are about Kia not fixing a credit reporting error after receiving a consumer's dispute.

117.    Kia had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

118.    Kia had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

119.    Kia had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

120.    Kia had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

121.    Kia had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

122.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because they believe that it would cost too much money to do so.

123.    Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

**CLAIMS FOR RELIEF**

**COUNT I:**
**VIOLATIONS OF § 1681e(b) of the FCRA**
**AGAINST EXPERIAN, TRANS UNION, and EQUIFAX**

124.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

125.    Experian, Trans Union, and Equifax willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they each published and maintained concerning Plaintiff.

126.    As a result of this conduct, action and inaction of Experian, Trans Union, and Equifax, Plaintiff suffered actual damages, including but not limited to: loss of credit opportunities, resulting in unfavorable financing terms and a lack of options regarding vehicles; time and money spent attempting to get the inaccuracies fixed; and significant mental, physical, and emotional stress and aggravation.

127.    Further, after Plaintiff's detailed disputes put Experian, Trans Union, and Equifax on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of its creditor-customers, they ignored that information and did not use any human or substantive review to confirm and verify that their procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

128.    Experian, Trans Union, and Equifax furnished multiple consumer reports to third parties containing the inaccurate tradeline information and Experian, Trans Union, and Equifax did so after receiving notice of these inaccuracies.

129.    The violations of 15 U.S.C. § 1681e(b) by Equifax, Experian, and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

130.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATIONS OF § 1681i OF THE FCRA**
**AGAINST EXPERIAN, TRANS UNION, and EQUIFAX**

131.   Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

132.   Experian, Trans Union, and Equifax each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff's credit files.

133.   Experian, Trans Union, and Equifax each violated 15 U.S.C. § 1681i(a)(2) by their conduct which includes, but is not limited to, failing to send to the furnisher all relevant information that they each received with Plaintiff's disputes.

134.   Experian, Trans Union, and Equifax each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Kia account.

135.   Experian, Trans Union, and Equifax each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

136.   After it received Plaintiff's September 2024 dispute letter, Equifax violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

137.   Further, Experian, Trans Union, and Equifax violated Section 1681i by conducting ***no investigation at all***. Section 1681i demands that when Plaintiff notified each of the Defendant CRAs directly of her dispute, that party—the consumer reporting

agency who received the dispute—must investigate that dispute. The statute does not contemplate someone other than the CRA conducting the investigation.

138.    As a result of this conduct, action and inaction of Experian, Trans Union, and Equifax, Plaintiff suffered actual damages, including but not limited to: loss of credit opportunities, resulting in unfavorable financing terms and a lack of options regarding vehicles; time and money spent attempting to get the inaccuracies fixed; and significant mental, physical, and emotional stress and aggravation.

139.    The violations of 15 U.S.C. § 1681i by Equifax, Experian, and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

140.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Experian, and Trans Union in amount to be determined by the Court pursuant to 15 U.S.C. § 1681n & § 1681o.

**COUNT III:**
**VIOLATIONS OF § 1681s-2(b)(1)(A) and (B) OF THE FCRA**
**AGAINST KIA**

141.    Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

142.    On at least one occasion within the last two years, by example only and without limitation, Kia violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after the disputes were furnished to it by a Defendant CRA.

143.    On at least one occasion within the past two years, by example only and without limitation, Kia violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agencies.

144.    When Plaintiff submitted her disputes to the CRAs, they used a dispute system named "e-Oscar," which has been adopted by the CRAs and by their furnisher-customers such as Kia. It is an automated system and the procedures used by the CRAs are systemic and uniform.

145.    When a CRA receives a consumer dispute, it (usually via an offshore, outsource vendor), translates that dispute into an "ACDV" form.

146.    The ACDV form is the method by which Kia has elected to receive consumer disputes pursuant to 15 U.S.C. § 1681i(a).

147.    Based on the manner in which the CRAs responded to – or did not respond to Plaintiff's disputes, representing that Kia had "verified' the supposed accuracy of its reporting, Plaintiff alleges that at least two of the CRAs did in fact forward Plaintiff's disputes via ACDVs to Kia.

148.    Kia understood the nature of Plaintiff's disputes when it received the ACDVs from the CRAs.

149.    Notwithstanding the above, Kia follows a standard and systemically unlawful process when it receives ACDV disputes. Basically, all Kia does is review its own internal computer screen for the account and repeat back to the ACDV system the same inaccurate information that Kia already had reported to the CRAs.

150.    When Kia receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether or not the information already in its computer system is itself accurate.

151.    As a result of the conduct, action, and inaction of Kia, Plaintiff suffered actual damages, including but not limited to: loss of credit opportunities, resulting in unfavorable financing terms and a lack of options regarding vehicles; time and money spent attempting to get the inaccuracies fixed; and significant mental, physical, and emotional stress and aggravation.

152.   The violations of 15 U.S.C. § 1681s-2(b)(1)(A) and (B) by Kia were willful, rendering Kia liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Kia was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

153.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Kia in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT V:**
**VIOLATION OF § 1681s-2(b)(1)(C)-(D) OF THE FCRA**
**AGAINST KIA**

154.   Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

155.   Kia has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether or not the consumer disputes such reporting. *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

156.   On one or more occasions within the past two years, by example only and without limitation, Kia violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiff's credit files with the CRAs in response to her disputes without also including an accurate notation that the debt was disputed and by failing to correctly report results of an accurate investigation to the CRAs.

157.   On information and belief, Plaintiff alleges that Kia frequently fails to add the correct notation indicating that the account is disputed when it responds to the e-Oscar ACDVs.

158.   On information and belief, Plaintiff alleges that, after Kia responds to an e-Oscar ACDV from one consumer reporting agency, Kia rarely (if ever) reports the disputed nature of that debt to all consumer reporting agencies reporting that tradeline.

159.   Plaintiff's disputes were, at minimum, bona fide.

160.   As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiff suffered actual damages including but not limited to: loss of credit opportunities, resulting in unfavorable financing terms and a lack of options regarding vehicles; time and money spent attempting to get the inaccuracies fixed; and significant mental, physical, and emotional stress and aggravation.

161.   Kia was aware of the *Saunders v. Branch Banking & Trust* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

162.   On information and belief, Plaintiff alleges that the procedures followed regarding Plaintiff's FCRA disputes through e-Oscar were the procedures that Kia intended its employees or agents to follow.

163.   On information and belief, Plaintiff alleges that Kia's employees or agents did not make mistakes in the way they followed Kia's procedures when they received, processed and responded to the CRAs' ACDVs and did not include a proper notation regarding the accounts being in dispute.

164.   On information and belief, Plaintiff alleges that Kia has not materially changed its FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of its failures in this case.

165.   The violations by Kia were willful, rendering Kia liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Kia was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

166.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Kia in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT V:
### VIOLATIONS OF § 1681s-2(b)(1)(E) OF THE FCRA
### AGAINST KIA

167.   Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

168.   Kia violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from the CRAs. These failures to correct Plaintiff's information resulted from Kia's failures to investigate after receiving Plaintiff's disputes, as articulated in this Complaint.

169.   As a result of the conduct, action, and inaction of Kia, Plaintiff suffered actual damages, including but not limited to: loss of credit opportunities, resulting in unfavorable financing terms and a lack of options regarding vehicles; time and money spent attempting to get the inaccuracies fixed; and significant mental, physical, and emotional stress and aggravation.

170.   The violations of 15 U.S.C. § 1681s-2(b)(1)(E) by Kia were willful, rendering Kia liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Kia was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

171.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Kia in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT VI:
### VIOLATION OF § 1785.16 OF THE CCRAA
### AGAINST EXPERIAN, TRANS UNION, and EQUIFAX

172.   Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

173.   At all times relevant to this action, the CRA Defendants were subject to and required to abide by the laws of the State of California, including, without limitation, California Civil Code § 1785.16, regarding the information they reported about Plaintiff , a California resident.

174.   The CRA Defendants' acts and omissions, as articulated in this Complaint, constitute numerous and multiple violations of the CCRAA.

175.   Experian, Trans Union, and Equifax violated § 1785.16 by failing to reinvestigate information disputed by Plaintiff as clearly indicated within the disputes they received. Plaintiff clearly indicated the errors on the reported information on her consumer reports; however, Experian, Trans Union, and Equifax failed to acknowledge, investigate, update, or delete the inaccurate and derogatory information reported.

176.   Experian, Trans Union, and Equifax likewise failed to consider all relevant information in considering Plaintiff's disputes, as required by CCRAA § 1785.16(b). Plaintiff included enough information for the CRAs to resolve the disputes in her favor, and offered contact information should the CRAs have needed additional information in processing her disputes. Discovery will confirm that Experian, Trans Union, and Equifax did nothing with that information in "investigating" Plaintiff's disputes.

177.   Discovery will confirm that all Experian, Trans Union, and Equifax did was convey Plaintiff's disputes to Kia and take no action that could be considered a reasonable investigation of Plaintiff's disputes.

178.   As a result of this conduct, action and inaction of Experian, Trans Union, and Equifax, Plaintiff suffered actual damages, including but not limited to: loss of credit opportunities, resulting in unfavorable financing terms and a lack of options regarding vehicles; time and money spent attempting to get the inaccuracies fixed; and significant mental, physical, and emotional stress and aggravation.

179.   As a result of each and every negligent violation of the CCRAA, Plaintiff is entitled to damages as the Court may allow pursuant to CAL. CIV. CODE § 1785.16(a).

180.    As a result of each and every willful violation of the CCRAA, Plaintiff is entitled to damages as the court may allow pursuant to CAL. CIV. CODE § 1785.31(a)(2) against Experian, Trans Union, and Equifax, including punitive damages of $100 to $5,000 per willful violation.

181.    Plaintiff is also entitled to injunctive relief against Experian, Trans Union, and Equifax pursuant to CAL. CIV. CODE § 1785.31(b).

182.    Plaintiff is further entitled to recover her court costs and attorneys' fees pursuant to CAL. CIV. CODE § 1785.31(d).

**COUNT VII:**
**VIOLATIONS OF § 1785.25 OF THE CCRAA**
**AGAINST KIA**

183.    Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

184.    Section 1785.25(a) of the CCRAA requires that "[a] person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." CAL. CIV. CODE ANN. § 1785.25(a).

185.    The Federal Fair Credit Reporting Act does not preempt Section 1785.25(a). 15 U.S.C. § 1681t(b)(1)(F)(ii).

186.    The phrase "incomplete or inaccurate" in § 1785.25(a) requires furnishers of credit information from not only "refrain[ing] from making any reports that are obviously wrong or missing crucial data, but also that the reports not contain information that is materially misleading. The statutory term 'should have known' imparts a test of reasonableness." *Gamble v. Synchrony Bank*, No. EDCV 19-1229 JGB (SPx), 2020 WL 4258646, at *4 (C.D. Cal. Apr. 30, 2020). In that regard, the critical question is thus whether a reasonable furnisher would have known that the furnished information was incomplete or inaccurate.

187.   An item on a credit report can be "incomplete or inaccurate" because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.

188.   Kia violated § 1785.25(a) of the CCRAA by reporting to CRAs information about Plaintiff that was inaccurate. The information was inaccurate because Plaintiff paid every amount billed by Kia in a timely manner, as it came due.

189.   Kia knew or should have known that it was wrong to report the account as "charged off", as it had access to account-level information that would permit it to learn the truth about the account status.

190.   Discovery will show that Kia's conduct is a part of a broader practice of frequent and persistent noncompliance with California's credit reporting laws.

191.   As a result of the conduct, action, and inaction of Kia, Plaintiff suffered actual damages, including but not limited to: loss of credit opportunities, resulting in unfavorable financing terms and a lack of options regarding vehicles; time and money spent attempting to get the inaccuracies fixed; and significant mental, physical, and emotional stress and aggravation.

192.   Based on Kia's noncompliance with the CCRAA, Plaintiff seeks actual damages, punitive damages, reasonable attorneys' fees, and costs, pursuant to CAL. CIV. CODE § 1785.31.

### COUNT VIII:
### VIOLATIONS OF CALIFORNIA'S ELDER ABUSE & DEPENDENT ADULT CIVIL PROTECTION ACT
### AGAINST TROPHY AUTOMOTIVE

193.   Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

194.   "Since 1982, the Legislature has enacted numerous measures to prevent the abuse of elders." *Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 734-735 [112 Cal.Rptr.3d 439].) citing *ARA Living Centers – Pacific, Inc. v. Superior Court* (1993) 18

Cal. App.4th 1556, 1559-1560; *Zimmer v. Nawabi* (E.D. Cal. 2008) 566 F.Supp.2d 1025, 1033-1034). "Generally, the Legislature has proceeded carefully and diligently in its efforts to curb the worst practices against our elders." *Id.* (citing Balisok, Elder Abuse Litigation (The Rutter Group 2009) ¶ 1:22 p. 1-3 (rev. #1, 2009)).

195.    To address these concerns, the Legislature has enacted the Elder Abuse and Dependent Adult Civil Protection Act. The California Legislature "recognize[d] that elders and dependent adults may be subjected to abuse, neglect, or abandonment and that [California] has a responsibility to protect these persons." (CAL. WELF. & INST. CODE, § 15600(a)). "The Legislature further recognizes that a significant number of these persons are elderly." (*Id.*, § 15600(b)). "The Legislature desires to direct special attention to the needs and problems of elderly persons, recognizing that these persons constitute a significant and identifiable segment of the population and that they are more subject to risks of abuse, neglect, and abandonment." (*Id.*). Finally, "[t]he Legislature further finds and declares that infirm elderly persons and dependent adults are a disadvantaged class, that cases of abuse of these persons are seldom prosecuted as criminal matters, and few civil cases are brought in connection with this abuse due to problems of proof, court delays, and the lack of incentives to prosecute these suits." (*Id.*, § 15600(h)).

196.    Under the Elder Abuse and Dependent Adult Civil Protection Act, "financial abuse" of an elder occurs when a person or entity retains personal property of an elder for a wrongful use, and the person or entity knew or should have known such conduct was likely harmful to the elder. *See* CAL. CIV. CODE § 15610.30.

197.    Trophy Automotive charged Plaintiff a mileage overage fee on a lease and then failed to apply the payment towards the fee for approximately three years.

198.    Trophy Automotive retained Plaintiff's personal property (i.e., her money) for wrongful use, which harmed Plaintiff.

199.    Trophy Automotive knew or should have known that its conduct was likely to harm Plaintiff.

200.   The foregoing acts and omissions by Trophy Automotive constitute violations of California's Elder Abuse & Dependent Adult Civil Protection Act.

201.   As a result of Trophy Automotive's violation of the Elder Abuse Law, Plaintiff seeks compensatory damages, punitive damages, treble damages pursuant to CAL. CIV. CODE §3345, attorneys' fees, and costs.

## COUNT IX:
## VIOLATIONS OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT AGAINST TROPHY AUTOMOTIVE

202.   Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

203.   Pursuant to CAL. CIV. CODE § 1770(14), "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" is unlawful when "undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer."

204.   When the Kia dealership agent represented to Plaintiff that she did not need to worry about the mileage overage fee because they would "roll it into" the new lease, that agent represented that the transaction conferred rights or obligations that it did not have or involve, in violation of CAL. CIV. CODE § 1770(14).

205.   In the alternative, when the Kia dealership agent represented to Plaintiff that they had the authority to alter the terms of the first Kia lease by incorporating the mileage overage fee into the subsequent lease, they misrepresented their authority, in violation of CAL. CIV. CODE § 1770(18).

206.   Pursuant to CAL. CIV. CODE § 1780(b)(1), Any consumer who is a senior citizen, as defined in subdivision (f) of Section 1761, as part of an action under subdivision (a), may seek and be awarded, in addition to the remedies specified therein, up to five thousand dollars ($5,000) where the trier of fact does all of the following:

> A. Finds that the consumer has suffered substantial physical, emotional, or economic damage resulting from the defendant's conduct.

B. Makes an affirmative finding in regard to one or more of the factors set forth in subdivision (b) of Section 3345.

C. Finds that an additional award is appropriate.

207.  Plaintiff has suffered substantial physical, emotional, and economic damage resulting from Trophy Automotive's conduct.

208.  Trophy Automotive knew or should have known that its conduct was directed to a senior citizen. This satisfies the first factor in subdivision (b) of Section 3345.

209.  As a result of each and every violation of the California Consumers Legal Remedies Act, Plaintiff seeks compensatory damages, punitive damages, attorneys' fees and costs.

210.  Further, Plaintiff requests that the Court find that an additional award is appropriate pursuant to CAL. CIV. CODE § 1780(b)(1).

## COUNT X:
## VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW AGAINST TROPHY AUTOMOTIVE

211.  Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

212.  When the Trophy Automotive agent told Plaintiff that Trophy would roll the cost of the mileage overage fee into the new contract, Trophy Automotive made a statement to Plaintiff, concerning a circumstance or matter of fact connected with the proposed disposition of personal property, which was untrue or misleading, and which was known, or which by the exercise of reasonable care should have been known, to be untrue to misleading.

213.  In making that statement, Trophy Automotive violated CAL. BUS. & PROF. CODE § 17500.

214.  Trophy Automotive damaged Plaintiff by making a false statement, which Plaintiff relied upon, and which ultimately left Plaintiff with destroyed credit and few options for purchasing a vehicle.

215.   As a result of Trophy's violation of California's False Advertising Law, Plaintiff seeks restitution, treble damages pursuant to CAL. CIV. CODE §3345, attorneys' fees, and costs.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory, and punitive damages individually against each Defendant; for her attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate; specific performance and injunctive relief; treble damages pursuant to CAL. CIV. CODE § 3345; injunctive relief and restitution, where appropriate; and such other relief the Court deems just and proper.

July 10, 2025.

Respectfully Submitted,

**PEGGY ANNE HANSEN**

By:   */s/ Craig C. Marchiando*
Craig C. Marchiando (SBN 283829)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
1 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Tel: (757) 930-3660
Fax: (757) 930-3662
craig@clalegal.com

*Counsel for Plaintiff*